# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 97-CA-01276-COA

**PEGGY SPRADLING MCCORD, EXECUTRIX**                    **APPELLANT**

**v.**

**NINA M. SPRADLING**                                            **APPELLEE**

DATE OF JUDGMENT:               09/25/1997
TRIAL JUDGE:                    HON. ANTHONY THOMAS FARESE
COURT FROM WHICH APPEALED:      CALHOUN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         CLIFF R. EASLEY JR.
ATTORNEY FOR APPELLEE:          LINDSEY C. MEADOR
NATURE OF THE CASE:             CIVIL - WILLS, TRUSTS AND ESTATES
TRIAL COURT DISPOSITION:        FOUND FOR APPELLEE
DISPOSITION:                    AFFIRMED IN PART AND REVERSED, RENDERED AND
                                REMANDED IN PART 06/22/99
MOTION FOR REHEARING FILED:     07/06/99 - 12/12/00
CERTIORARI FILED:               12/22/2000; granted 2/22/2001
MANDATE ISSUED:

ON MOTION FOR REHEARING

EN BANC

IRVING, J., FOR THE COURT:

¶1. Nina M. Spradling's motion for rehearing is denied. However, the original opinion issued by the Court is withdrawn, and the following opinion is substituted therefor.

¶2. Appellant, Peggy Spradling McCord, the executrix of the estate of J. W. Spradling, a/k/a James William Spradling, deceased, appeals from a judgment of the Chancery Court of Calhoun County granting the appellee, Nina M. Spradling, a judgment in the amount of $34,661.58. Peggy Spradling McCord is the natural daughter of J. W. Spradling, a/k/a James William Spradling, deceased, and Nina M. Spradling is his widow. For brevity and clarity, Mrs. McCord will be referred to as "the executrix" and Mrs. Spradling as "the widow."

¶3. The judgment is comprised of the following constituents:

(a) $22,050.62 representing the proceeds of a Federal Employees Group Life Insurance policy on Mr. Spradling's life;

(b) $6,502.18 paid for funeral expenses by Mrs. Spradling from proceeds withdrawn by Mrs.

Spradling from a bank account jointly held in the names of the decedent; the widow; Carolyn Murphree, daughter of the decedent; and Carolyn Wilburn, daughter of the widow;

(c) $4,908.78 representing cotton land rent for the year 1996;

(d) $1,200 representing a one half equitable interest in the hay crop for the year 1996.

¶4. The executrix contends in this appeal that the trial court erred: (1) in holding that the life insurance proceeds belonged to the widow, (2) in holding that the estate was obligated to reimburse the widow the sum of $6,502.18 for funeral expenses and that the money in a jointly held bank account belonged to the widow, (3) in holding that the estate owed the widow $4,908.78 for the 1996 cotton land rent and $1,200 for one half of the hay inventory, (4) in denying the executrix's claim for attorney's fees and (5) in not requiring counsel for the widow to submit the proposed judgment to counsel for the executrix prior to submitting same to the court.

¶5. We affirm the trial court on issues two, four and five. We also affirm the trial court in part as to issue three, that is, we affirm the award of $1,200 to the widow for one half the hay inventory but reverse and render as to the award of $4,908.78 for the 1996 cotton land rent. As to issue one, we affirm the trial court's decision that the widow does not hold the life insurance proceeds in a constructive or resulting trust and that she is entitled to those proceeds. However, we reverse and remand for further consideration of the related issue as to whether the widow violated the terms of the antenuptial agreement when she applied for the insurance proceeds.

## FACTS

¶6. The decedent, J. W. Spradling, and the widow, Nina M. Spradling, first met on February 13, 1995 and were married on March 18, 1995. At the time of marriage, Mrs. Spradling was seventy-two years of age and had been married previously to Knox Barfield, who died on December 26, 1989. Four children were born of the marriage between the widow and Mr. Barfield. The decedent, J. W. Spradling, was eighty years of age at the time of his death on November 25, 1996, and had been married previously to Nadine Spradling, who died in 1993. Eight children were born of the marriage between J. W. and Nadine. Two of those children predeceased the decedent.

¶7. On or about February 23, 1995, ten days after the decedent, J. W. Spradling, and the widow, Nina Myrl Spradling, met, they had an antenuptial agreement prepared for them. Said agreement was executed on March 1, 1995. The antenuptial agreement, which will be set forth later in our discussion of the issues, provided that each of the parties would have the full control and management of all property that they then owned or thereafter acquired or accumulated. They also reserved the right to make disposition of the property owned by each, according to the will and pleasure of each, so that the property of each would descend to their respective child or children, or the heirs of their body, at the respective party's death. Said agreement further provided that it was the intent and purpose of each party to own, control and be secure in the full right, title and interest in and to all real or personal property which each then owned, to the same extent that each would, if they remained unmarried. Each of the parties agreed to waive and release any and all of his or her interest in the property of the other, either as a surviving spouse or otherwise. Each of said parties contracted and agreed to make no claim against the estate of the other on the basis of being the spouse of the other. The widow admitted that it was the intent of both, she and the decedent, that everything each owned would be left to their respective children.

¶8. A bank account was acquired in the joint names of the decedent, the widow, and a daughter of each. The decedent conveyed, by warranty deed, all of his real property to his children, but reserved unto himself, and if married at his death -- unto his wife also, a life estate in the marital domicile and one acre of land. The last will and testament of J. W. Spradling, probated in this cause, left everything to his children.

¶9. The decedent was retired from the U.S. Corp of Engineers. He had a group life insurance policy with Metropolitan Life Insurance Company through the Federal Employees Group Life Insurance Act (FEGLIA). The designated beneficiary of the policy was the decedent's predeceased first wife, Nadine Spradling. The effect of this situation was that there was no designated beneficiary at the time of the decedent's death. The widow and the decedent's children testified at trial that it was their understanding that the proceeds from the FEGLIA insurance policy would go to the children.

¶10. The widow testified at trial that she telephoned the insurance company after the death of her husband to inquire about medical insurance and was informed that she was entitled to the proceeds from the life insurance policy. Claim forms sent to the widow were completed and returned, and the sum of $22,050.62 was paid to her pursuant to 5 U.S.C. § 8705 and the FEGLIA Regulations. The order of precedence for payment of the decedent's life insurance was the widow, if she made a claim, and then to the children of the decedent, if the widow made no claim within one year. It is the executrix's contention that the proceeds of the life insurance policy belong to the estate.

¶11. During his lifetime, the decedent rented a portion of the real property that he owned to an individual who grew cotton on the land and paid rent to the decedent from the sale of the crop. Three checks, representing the 1996 rent payment, are the subject of dispute between the parties herein.

¶12. At the time of his death, the decedent had a hay inventory of approximately 120 bales valued at approximately $20 per bale or $2400. The value of the hay inventory and the issue of the distribution of its monetary worth is also a matter that is being contested by the parties herein.

## ANALYSIS AND DISCUSSION OF THE ISSUES

### 1. Ownership of the Life Insurance Proceeds

¶13. 5 U.S.C. § 8705 and the regulations of the Federal Employee Group Life Insurance Act (FEGLIA) provide the order of precedence in paying a death claim; it reads in pertinent part as follows:

8705. Death claims; order of precedence; escheat

(a) Except as provided in subsection (e), the amount of group life insurance and group accidental death insurance in force on an employee at the date of his death shall be paid, on the establishment of a valid claim, to the person or persons surviving at the date of his death, in the following order of precedence:

First, to the beneficiary or beneficiaries designated by the employee in a signed and witnessed writing received before death in the employing office or, if insured because of receipt of annuity or of benefits under subchapter I of chapter 81 of this title as provided by section 8706(b) of this title, in the Office of Personnel Management. For this purpose, a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed has no force or effect.

Second, if there is no designated beneficiary, to the widow or widower of the employee.

Third, if none of the above, to the child or children of the employee and descendants of deceased children by representation.

Fourth, if none of the above, to the parents of the employee or the survivor of them.

Fifth, if none of the above, to the duly appointed executor or administrator of the estate of the employee.

Sixth, if none of the above, to other next of kin of the employee entitled under the laws of the domicile of the employee at the date of his death.

(b) If, within 1 year after the death of the employee, no claim for payment has been filed by a person entitled under the order of precedence named by subsection (a) of this section, or if payment to the person within that period is prohibited by Federal statute or regulation, payment may be made in the order of precedence as if the person had predeceased the employee, and the payment bars recovery by any other person.

¶14. Claim forms sent to the widow, at her request, were completed and returned, and the sum of $22,050.62 was paid to her pursuant to 5 U.S.C. § 8705 and the FEGLIA Regulations. The order of precedence for payment of the decedent's life insurance was the widow, if she made a claim, and then to the children of the decedent, if the widow made no claim within one year.

¶15. It is the executrix's contention that the proceeds of the life insurance policy belong to the estate. The executrix urges this Court to make a finding that the widow holds the $22,050.62 insurance proceeds, paid to her by the office of the Federal Employee's Group Life Insurance on the life of J. W. Spradling, in a constructive or resulting trust for the children and/or estate of the deceased. In support of her claim, the executrix contends that the widow obtained the proceeds by filing a claim for the same in violation of the antenuptial agreement.

¶16. The portion of the antenuptial agreement relied upon by the executrix reads as follows:

-6-

WHEREAS, it is the intent and purpose of each party hereto to own, control and be secure in their full right, title, and interest in and to all real or personal property which they now own, to the extent each would, if they remained unmarried. Each of the parties hereto does hereby agree to waive and release any and all of his or her interest in the property of the other, either as a surviving spouse or otherwise, and *each of said parties do hereby contract and agree to make no claim against the estate of the other, because of the fact that either party is the spouse of the other.* This paragraph shall not prohibit either party from providing for the other party in either of said party's Last Will and Testament, if they so desire.

¶17. The executrix argues that in paragraph 6 of the antenuptial agreement, quoted above, both parties agreed to make no claim against the estate of the other because of the fact that either is the spouse of the other. The executrix contends that the filing of the claim for the insurance proceeds places the widow in violation of paragraph 6 of the agreement.

¶18. The widow and the decedent's children testified at trial that it was their understanding that the proceeds from the FEGLIA insurance policy would go to the children. However, the widow defended her action in filing the claim by explaining that the insurance company told her that, as the surviving spouse, she was entitled to the proceeds. She testified that she learned of this entitlement when she telephoned the insurance company after the death of her husband to inquire about medical insurance. As stated, the widow admitted that it was her understanding that her deceased husband's intention was for the proceeds of the insurance to go to his children.

¶19. The supreme court long ago stated the definition of a constructive trust in *Saulsberry v. Saulsberry*, 223 Miss. 684, 78 So. 2d 758 (1955) as follows:

> A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. *Id*. at 690, 78 So. 2d at 760 (citations omitted).

This Court has also stated that "It is the relationship plus the abuse of confidence imposed that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused." *Lipe v. Souther*, 224 Miss. 473, 484, 80 So. 2d 471, 475 (1955), quoting *Summer v. Summer*, 224 Miss. 273, 80 So. 2d 35, 37 (1955); *Alvarez*, 642 So. 2d at 368. Additionally, clear and convincing evidence is required to establish a constructive trust. *Planters Bank & Trust Co. v. Sklar,* 555 So. 2d 1024, 1034 (Miss. 1990); *Allgood v. Allgood*, 473 So. 2d 416, 421 (Miss. 1985); *Shumpert v. Tanner*, 332 So. 2d 411, 412 (Miss. 1976); *Sojourner v. Sojourner,* 247 Miss. 342, 356, 153 So. 2d 803, 809 (Miss. 1963) . Furthermore, as the final appellate Court in Mississippi, our standard of review of findings of fact, including those regarding a constructive trust, is limited in that we must not set aside a chancellor's findings of fact so long as they are supported by substantial credible evidence. *Allgood*, 473 So. 2d at 421. However, this Court retains a de novo review of all questions of law, including those regarding the applicability of a constructive trust. *Seymour v. Brunswick*, 655 So. 2d 892 (Miss. 1995); *Harrison County v. City of Gulfport*, 557 So. 2d 780, 784 (Miss. 1990).

¶20. On the basis of the cited authorities, this Court finds that this issue presents a pure question of law and calls for a *de novo* review.

¶21. As stated earlier, Nadine Spradling, the deceased first wife of J.W. Spradling, was the designated beneficiary of the insurance policy. Effectively, this was no designated beneficiary, and the order of precedence under FEGLIA mandates payment to the widow as the surviving spouse.

¶22. However, the fact that the proceeds were properly paid to the widow under the order of precedence under FEGLIA when no beneficiary was designated does not resolve the question as to whether the widow is immune from a breach of contract suit in the face of the terms and conditions of the antenuptial agreement which she signed. Stated another way, does the antenuptial agreement arm either the estate or the children of J. W. Spradling with a legal vehicle for redress, despite the fact that the policy amount was lawfully and legally paid to the widow under the order of precedence established under FEGLIA? We think it does.

¶23. The court below, in overruling the executrix's contention, held that there is no federal court (either district court or court of appeals) in the U.S. which holds that a constructive trust or state law principles can

override the order of precedence stated in 5 U.S.C.A. Section 8705. We agree.

¶24. In *Ridgway v. Ridgway,* 454 U.S. 46 (1981), one of the case authorities cited by the lower court in support of its holding on this issue, the United States Supreme Court compared FEGLIA to a similar federal statute, Servicemen's Group Life Insurance Act (SGLIA). SGLIA contains an anti-attachment clause. The Supreme Court held that the anti-attachment provision preempted a state divorce decree which sought to impose a constructive trust upon life insurance proceeds. The court also expressly stated that if Congress chose to avoid the result in that case, it could do so by enacting legislation which did not include an anti-attachment provision. *Id*. at 62.

¶25. The facts in *Ridgway* were these. Army Sergeant Ridgway and his first wife, April, were granted a divorce by a Maine court. The divorce decree ordered Ridgway to keep in force the insurance policies on his life then outstanding for the benefit of the Ridgways' children. At the time of the divorce, the sergeant's life was insured under a $20,000 policy issued by Prudential Insurance Co. of America pursuant to the Servicemen's Group Life Insurance Act of 1965 (SGLIA), and April was the designated beneficiary. Subsequently, Ridgway married Donna, and changed the policy's beneficiary designation to one directing that the proceeds would be paid as specified by law. *Ridgway,* 454 U.S. at 47.

¶26. After the sergeant's death, both April and Donna filed claims to the policy proceeds, and April instituted suit in Maine Superior Court against Prudential, seeking to enjoin payment of the proceeds to Donna and to obtain a declaratory judgment that the proceeds were payable to the children under the divorce decree. Donna joined the suit as a plaintiff asserting a claim to the proceeds based on the beneficiary designation and her status as Ridgway's widow. April filed a cross-claim, praying for the imposition of a constructive trust for the children's benefit on any proceeds paid to Donna. *Id.* at 47. The superior court rejected April's claims, taking the view that a constructive trust would interfere with the operation of the SGLIA and thus would run afoul of the Supremacy Clause. The Maine Supreme Judicial Court vacated the dismissal of April's cross-claim and remanded with directions to enter an order naming Donna as constructive trustee of the policy proceeds. The case eventually arrived at the United States Supreme Court which held that the insured's beneficiary designation under the SGLIA policy prevails over the constructive trust imposed upon the policy proceeds by the Maine court.

¶27. In arriving at the decision, the Supreme Court discussed the holding in *Yiatchos v. Yiatchos,* 376 U.S. 306 (1964), and observed:

> There, the decedent Yiatchos, a resident of a community property State, purchased United States Savings Bonds with community funds and had them issued in the name of the decedent but payable on his death to his brother. The state court held that this purchase "was in fraud of the rights" of the surviving wife, as "a void endeavor to divest the wife of any interest in her own property." *In re Yiatchos Estate*, 60 Wash. 2d 179, 181-182, 373 P.2d 125, 127 (1962). This Court agreed that the bonds could "not be used as a device to deprive the widow of property rights which she enjoys under Washington law." 376 U.S., at 309, 84 S.Ct., at 745. *But because the named beneficiary was entitled to the bonds "unless his deceased brother committed fraud or breach of trust tantamount to fraud" by wrongfully disposing of the wife's property, ibid., the case was remanded to give the widow an opportunity to demonstrate that she had not consented to or ratified the purchase and registration of the bonds.* The remand was also for the determination, under state law, whether the widow had an interest in the community's specific assets, or only a half

interest in the estate generally.

Here, in contrast, Sergeant Ridgway's conduct did not amount to breach of trust or conversion of another's property. A careful reading of the complaint and the amended complaint, . . . in this case reveals no allegation of fraud or breach of trust. And we are not inclined to provide or infer such an allegation when a case comes to us, as this one does, with the record indicating nothing more than a breach of contract on the part of the deceased service member. Indeed, to say that this type of conduct constitutes constructive fraud would be to open the policy proceeds to a suit by any commercial creditor, a result that would render § 770(g) nugatory. *As the trial court intimated, respondents may have a claim against the insured's estate for that breach; the record does not disclose whether a claim of that kind would be collectible.*

*Ridgway,* 454 U.S. at 58-59. (emphasis added).

¶28. Based upon *Ridgway,* we conclude that the chancellor was correct in holding that a constructive trust could not be utilized to preempt the widow's entitlement to the insurance proceeds under the order of precedence set forth in the statute creating FEGLIA, and the insurance proceeds were properly paid to the widow. We also hold that even if the antenuptial agreement had specifically designated the decedent children as the beneficiaries, the widow would still have the right to claim the proceeds under the order of precedence provision of FEGLIA. We think *Ridgeway,* though dealing with a claim under SGLIA, makes this much exceedingly clear. But, as stated, the conclusion that the proceeds of the policy in question were properly paid to the widow and are beyond the reach of a constructive trust, does not necessarily result in the conclusion that the executrix and children of the decedent are without remedy.

¶29. The widow, by applying for the proceeds of the insurance policy on the life of her deceased husband, though having a clear and absolute right to do so under FEGLIA as interpreted by *Ridgeway*, may have breached the terms and conditions of the antenuptial agreement which she executed. Since there was no designated beneficiary, the owner of the insurance proceeds would be determined by application of the order of precedence in paying a death claim under FEGLIA. Under the order of precedence, the estate is listed as number five. Under subsection (1) of the order of precedence, if persons listed in numbers 1 through 4 do not file a claim, the proceeds fall to the estate. The widow is listed as number two in the order of precedence. Since her filing cuts off persons listed below her and since the estate is listed below her, a credible and legitimate argument is made that her filing may have been against the estate. Also, the children are listed third, and of course her filing cut off the children's claim as well. The decedent's parents are listed as number four, but they were already deceased.

¶30. The dissent argues that the widow must prevail here because, under the provisions of FEGLIA, she was entitled to receive the proceeds of the life insurance policy. We agree that she was entitled to receive the proceeds and have all ready said as much in the preceding portion of this opinion, but that fact does not resolve the matter.

¶31. Citing *Metropolitan Life Ins. Co. v. Thompson,* 968 F. Supp. 312 (S.D. Miss. 1997), the dissent also argues that no provision in the antenuptial agreement could defeat the widow's right to claim the proceeds because the provisions of the FEGLIA concerning beneficiary designation override any contractual provision attempting to designate a beneficiary in any manner not in conformity with the provisions of FEGLIA. To this assertion, we also agree. But our holding does not turn on competing claims by beneficiaries designated under the FEGLIA provisions and different beneficiaries designated under the

antenuptial agreement, as was the case in *Metropolitan Life Ins. Co*. In our case, neither the executrix nor the beneficiaries of the estate are designated in the antenuptial agreement as beneficiaries of the insurance policy under FEGLIA.

¶32. The final question here then is not which designation of beneficiary provision controls but whether the executrix and beneficiaries of the decedent's estate may pursue a claim against the widow for an alleged breach of contract, *i.e.*, breach of the antenuptial agreement. The dissents reads *Metropolitan* and the other authorities cited to stand for the proposition that a designation of beneficiary under the FEGLIA or a beneficiary determined by the order of precedence under the FEGLIA trumps the entire provisions of the antenuptial agreement. We do not read *Metropolitan* so broadly. *Metropolitan* simply establishes the preeminence of the beneficiary provision under FEGLIA. It does not, in the least, address the question of whether a beneficiary may legally enter into a contract under state law to forego applying for life insurance proceeds of a policy issued under FEGLIA. In a nutshell, this is what the final issue in this case is all about.

¶33. The final issue cannot be framed, defined, narrowed and recast to be a question of who is entitled to the insurance proceeds. As stated, the widow is without doubt entitled to the proceeds. Also, it cannot be legitimately argued that the antenuptial agreement is at odds with the designation of beneficiary provisions of FEGLIA. None of the provisions of the antenuptial agreement mention the life insurance policy in question, nor is there any mention of any beneficiary in connection with any life insurance policy generally.

¶34. We also point out that nothing in FEGLIA mandates that one, entitled to benefits under its provisions, must make a claim for those benefits. One is legally free to ignore what he otherwise would be entitled to receive under FEGLIA beneficiary provisions. That much is made clear by subsection (b) of the relevant portion of the FEGLIA regulations which clearly contemplate that there may be a failure, for whatever reason, of a beneficiary to claim insurance proceeds which he is entitled to claim. As stated, that provision says:

> *If, within 1 year after the death of the employee, no claim for payment has been filed by a person entitled under the order of precedence named by subsection (a)* of this section, or if payment to the person within that period is prohibited by Federal statute or regulation, *payment may be made in the order of precedence as if the person had predeceased the employee, and the payment bars recovery by any other person.*

(emphasis added).

¶35. The controlling and exclusive beneficiary provisions of FEGLIA are implicated only when a claim is made. Before then, their all-encompassing powers are dormant. There is nothing in the FEGLIA regulations that required the widow to arouse those powers. The question for us is can she by contract legally agree not to arouse those powers? The answer is unequivocally, "yes."

¶36. If the widow had not made the claim, the insurance proceeds ultimately would have gone to the deceased's children and the estate. As stated, nothing in the FEGLIA regulations required the widow to make the claim. Likewise, there is nothing in the holding in *Metropolitan* that can be construed as prohibiting the widow from agreeing not to invoke the beneficiary provisions of FEGLIA. *Metropolitan* stands simply for the sole proposition that the provisions of FEGLIA govern designation of beneficiaries of life insurance proceeds, notwithstanding other contractual efforts to make a contrary designation. Stated another way, *Metropolitan* simply says that the provisions of FEGLIA governing beneficiaries of FEGLIA

insurance policies take precedence over conflicting beneficiary designations in separate agreements not on file with FEGLIA.

¶37. The widow's agreement not to take steps to obtain proceeds that she was legally entitled to receive is not one and the same as an agreement to *make* or *designate* another the lawful owner of those proceeds. For sure, such an agreement will operate to eventually make another the beneficiary of the proceeds, but that would happen by operation of the provisions of FEGLIA.

¶38. Since paragraph six of the antenuptial agreement prohibits the widow from making a claim against the estate, her action in filing the claim which cut off any claim by the estate may well be a claim against the estate. We note the record reflects that the executrix and children of the decedent filed a cross-bill and amended cross-bill against the widow wherein they sought recovery of the proceeds of the insurance policy from the widow on two theories: constructive or resulting trust, and breach of the terms and conditions of the antenuptial agreement.

¶39. We do not find in the record that the court dealt with the breach of contract claim. Hence, we remand the case for consideration of the following issues: (1) whether the antenuptial agreement was breached by the widow, and (2) if the agreement was breached, a determination as to the measure of damages for such breach. Though the executrix and beneficiaries of the decedent's estate sought to recover the insurance proceeds on a theory of breach of contract (the antenuptial agreement), and we are remanding for a determination as to whether a breach occurred, we hasten to point out that any damages awarded -- in case it is determined that a breach occurred -- should be based not on the face amount of the policy but on the measure of damages for breach of contract which might not necessarily be the same.

¶40. We do not believe our disposition of this issue runs afoul of the holding in *Ridgway*. We note that the *Ridgway* court specifically recognized that the respondents might have a cause of action against the sergeant's estate for breach of contract. While the widow here is not in the same position as was the sergeant in *Ridgway* who may have committed a breach of contract by his actions, that fact militates not in her favor but against her. Clearly, if the United States Supreme Court in *Ridgeway* recognized the availability of a breach of contract action against the estate of the sergeant who had the paramount and exclusive right to make the beneficiary designation under SGLIA, there would be no rational basis for proscribing such a right to the executrix and beneficiaries of the decedent's estate in our case.

¶41. The purpose of the order of precedence provision and paramount right of beneficiary designation under FEGLIA is to ensure that the person or persons designated by the insured in fact receive the proceeds of his life insurance policy upon his death, or in the case of a non-designation, that those whom the law imputes to him, likewise receive the same. Here, the widow's action appears to prevent the persons who, according to her own testimony, were the ones to whom the decedent wanted the proceeds to go. This fact not withstanding however, we want to make it exceedingly clear that, under the law as discussed, the widow is entitled to the proceeds. We simply hold that she is not immuned from a breach of contract action stemming from her actions. Though the breach of contract claim may arise out of action taken in relationship to the subject matter of the policy proceeds, it is a distinct and different issue from the right of entitlement to the proceeds of the insurance policy.

## II. Funeral Expenses and Money in Joint Account

¶42. As stated previously, prior to his death the decedent and the widow established a survivorship account

("801" account) at the Peoples Bank in the names of the decedent, the widow, Carolyn Murphree (one of the decedent's adult daughters) and Carolyn Wilburn (one of the widow's adult daughters). There was no controversy at trial that upon J.W. Spradling's death, the widow would own the funds remaining in this account. The executrix contends, however, that there was a prior agreement between the decedent and the widow that the decedent's funeral expenses were to be paid from this account before the widow took ownership of the remainder of the funds. The funeral expenses totaled $6,502.18.

¶43. The testimony at trial was that the widow transferred the funds from the survivorship account to her own individual account before the funeral expenses were paid. On the advice of her son, Danny J. Barfield, the widow later paid the funeral expense bill then sought reimbursement from the estate.

¶44. The only proof offered at trial on behalf of the estate on this issue was the testimony of the executrix and the executrix's sister, Carolyn Murphree. They each testified that they had heard their deceased father say that the 801 account was to pay his funeral expenses before the widow claimed the remainder of the funds. However, the executrix admitted that the widow was not a party to any of these discussions about the alleged agreement. The executrix also admitted that she never had any personal discussions about the alleged agreement with the widow. Carolyn Murphree testified to having had a discussion about the alleged agreement with the widow after her father's death. There was no testimony from anyone who claimed to have been present and personally witnessed any discussion of such an agreement between the decedent and the widow.

¶45. The widow testified that there was no agreement between her and the decedent about paying funeral expenses from the 801 account. Her testimony was that she paid the funeral expenses to avoid any unpleasantness immediately after the funeral, with the intention of filing a claim for reimbursement later. The chancellor found that there was no enforceable agreement to pay funeral expenses from the 801 account, and that the estate should bear the cost of the funeral expenses. Finding no error, we affirm the chancellor's ruling that the widow was entitled to be reimbursed for the funeral expenses.

¶46. The executrix argues that the agreement between her deceased father and the widow was that the widow was to receive all remaining funds in the 801 account after the funeral expenses were paid out of the account. She further argues that since the widow sought reimbursement from the estate for the funeral expenses paid by the widow, the widow should now be required to divvy up the original amount in the 801, before payment of funeral expenses, to the survivors of the account. However, the chancellor ruled that the money in the 801 account belonged exclusively to the widow. The executrix counters that the chancellor committed manifest error because Miss. Code Ann. § 81-5-63 (Rev. 1996) creates a presumption that title to the proceeds is vested in the names of all survivors. She is correct in this contention. However, the testimony from Carolyn Murphree, one of the decedent's children, during the trial of this matter was that no one other than the decedent and the widow placed money in the account and that the proceeds of the account, in the event of her father's death, were to be divided in half, with her father's funeral expenses being paid out of his half and the remainder going to the widow. When asked by the chancellor whether she was making claim to any portion of the proceeds, she answered in the negative. Thus, it appears that the claim by the executrix and/or Carolyn Murphree for a pro rata share of the 801 account came into existence as a result of losing the fight to have the funeral expenses paid out of the account instead of out of estate funds. On these facts, we cannot say the chancellor erred in ruling that the funds in the 801 account belonged to the widow.

### III. The 1996 Cotton Land Rent and Hay Inventory

¶47. While the decedent was in the hospital, a rental check payable to the decedent from David Brower in the amount of $4,908.78 for rent from the 1996 cotton crop was delivered to the executrix who endorsed it with her father's permission. She testified that her father told her to do what she wanted to with it. It was deposited in an account at the Mechanics Bank at Water Valley, Mississippi. This account was in the names of the decedent and his daughters from his first marriage. The widow had no rights to this account.

¶48. The decedent had deposited the previous year's rent checks in the 801 account. The chancellor found that the executrix, in depositing the check in the Mechanics Bank, had exercised her own discretion and acted outside her authority. It was the chancellor's judgment that the $4,908.78 rent belonged to the widow. He reasoned that because the rent check for the previous year had been deposited in the 801 account, that was the account where the 1996 rent check should have been deposited. We can find no support for such a conclusion in this record and reverse on this aspect of this issue.

¶49. Paragraph 7 of the antenuptial agreement provided that only property accumulated by the parties after marriage, by a joint venture or joint act of the parties, and property that was accumulated and acquired jointly by the parties, in their joint names, would be outside the antenuptial agreement. All other property would be subject to the laws of descent and distribution and any will of either party.

¶50. The decedent's right to the land rent derived from his ownership of the land. He owned the land prior to his marriage to the widow and his ownership continued throughout the marriage. The rent agreement was established long before the marriage and was between the decedent and the tenant and did not include the widow. Neither the decedent nor the widow did anything that could be construed as a joint act or venture as provided in paragraph 7 with regard to this rent arrangement during the marriage. Therefore, the cotton land rent fell within paragraph 4 of the antenuptial agreement and became part of the decedent's estate.

¶51. On the other hand, we find that the portion of the hay inventory that was acquired after the decedent's marriage to the widow does constitute property that was jointly acquired after the marriage and is subject to equitable division. The chancellor found that at the time of their marriage, the decedent had a hay inventory of approximately 20 bales. At his death, the hay inventory had increased to 140 bales. This constituted an increase of 120 bales of hay. The chancellor found that the widow had assisted her husband in the production of the hay by bringing water to the field, preparing food, and running errands. Valuing the 120 bale increase at $20 per bale yielded an increase in hay bale inventory of $2,400. The chancellor found that the widow was entitled to one-half of that amount or $1200. This Court agrees and affirms this aspect of this issue.

### IV. Claim for Attorney's Fees

¶52. The executrix argues that the decedent left a last will and testament which he made while married to his first wife, Nadine Spradling. Under the terms of his will everything was left to his children following the death of his first wife. Since, argues the executrix, there was nothing left to the widow in the will, she had no interest in the estate pursuant to the antenuptial agreement. Nevertheless, claims the executrix, the widow filed ten petitions and claims against the estate, in violation of her agreement, which were frivolous and filed for the purpose of harassment and/or delay, and which the widow and her attorney abandoned just prior to trial. The executrix contends that she should have been awarded reasonable attorney fees in defending and objecting to the petitions and claims.

¶53. The standard of review for awarding attorney fees, as set forth in *Regency Nissan, Inc. v. Jenkins,* 678 So. 2d 95, 102 (Miss. 1995) is as follows:

> Under our law, attorneys' fees are awarded on the basis of the information before the court, and the court's own opinion derived from "experience and observation." Miss.Code Ann. § 9-1-41 (1991 rev.). The standard for review of the award of attorneys' fees is abuse of discretion, and such awards must be supported by credible evidence. *Young v. Huron Smith Oil Co.*, 564 So. 2d 36, 40 (Miss. 1990).

¶54. The chancellor, in his discretion, found that the claims were "grievous" and not frivolous. This Court cannot say that such a finding under the circumstances was an abuse of his discretion. Therefore, finding no error, we affirm the decision of the chancellor on this issue.

### V. Failure to Tender Proposed Judgment to Counsel Opposite

¶55. Rule 5.04 of the Mississippi Uniform Chancery Court Rules reads as follows:

> RULE 5.04 JUDGMENT MUST BE SUBMITTED TO OPPOSING COUNSEL AND CHANCELLOR---WHEN
>
> In all litigated actions, the attorney who shall be directed to draw the Judgment shall submit the same to opposing counsel for criticism as to form only, and shall present the same to the Chancellor within ten (10) calendar days after being directed to draw the judgment unless otherwise permitted.

¶56. The executrix complains that the widow's attorney advised her attorney by letter to the chancellor dated September 26, 1997, that he was enclosing the proposed judgment in this case and was forwarding the executrix's attorney a copy of same for his criticism pursuant to Rule 5.04. On or about the same date, the attorney for the executrix received another letter with a copy of a proposed judgment from the widow's attorney to the chancellor, dated September 29, 1997, correcting the dollar amount in the first proposed judgment.

¶57. The attorney for the executrix immediately sent a letter to the chancellor objecting to the fact that counsel for the widow had failed to forward him the judgment for approval, pursuant to Rule 5.04, prior to sending it to the chancellor. He also set forth several objections and criticisms of the judgment. A copy of this letter was sent to the attorney for the widow and to the court clerk for filing. Within a day or so after forwarding the September 30, 1997 letter to the chancellor, the chancellor telephoned the executrix's attorney and advised that he had already signed the judgment. The point of Rule 5.04 is to afford the opposing counsel an opportunity to scrutinize any proposed order as to its form. As long as this purpose is achieved, this Court is of the opinion that the rule has been complied with. In the case at bar, counsel for the executrix was afforded this opportunity and the chancellor had an opportunity to examine his objections and criticisms as to the form of the judgment. Although it appears that the chancellor may have already signed the judgment when he received the letter from executrix's counsel setting forth counsel's objection, nothing would have prevented the chancellor from making any changes he deemed appropriate as a result of the recitals contained in counsel's letter. Further, assuming the chancellor had signed the judgment with substantive provisions that counsel thought were inappropriate for any reason, he could have filed, within ten days, a motion to alter or amend the judgment. We find that this issue is without merit.

¶58. **THE JUDGMENT OF THE CHANCERY COURT OF CALHOUN COUNTY FINDING NO CONSTRUCTIVE TRUST AS TO THE INSURANCE PROCEEDS AND AWARDING THE PROCEEDS TO APPELLEE IS AFFIRMED. THE JUDGMENT OF THE CHANCERY COURT ON THE ISSUE OF REIMBURSEMENT OF FUNERAL EXPENSES IS AFFIRMED. THE JUDGMENT OF THE CHANCERY COURT ON THE ISSUE OF THE COTTON RENT CHECK IS REVERSED AND RENDERED. THE JUDGMENT OF THE CHANCERY COURT ON THE ISSUE OF THE HAY PROCEEDS IS AFFIRMED. THE JUDGMENT OF THE CHANCERY COURT ON THE ISSUE OF ATTORNEY FEES IS AFFIRMED. THE JUDGMENT OF THE CHANCERY COURT ON THE ISSUE OF THE FORM OF THE JUDGMENT IS AFFIRMED. THE CASE, HOWEVER, IS REMANDED TO THE CHANCERY COURT FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION IN REGARDS TO APPELLANT'S CONTRACT CLAIM. THE COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.**

**KING, P.J., LEE, PAYNE, AND THOMAS, JJ., CONCUR. SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., AND BRIDGES, J. MOORE AND MYERS, JJ., NOT PARTICIPATING.**

**SOUTHWICK, P.J., DISSENTING**:

¶59. In a thorough and logical description of the facts and the applicable law, the majority determines that the chancellor must be reversed. With great respect for the persuasiveness with which that view is expressed, I find that the federal statute establishes Mrs. Spradling's right to claim these insurance benefits. That right cannot be overridden by an agreement that fails to comply with the statutory procedures for designating beneficiaries. Anyone entering an agreement with someone who has at that time or later acquires insurance coverage governed by this program is constructively on notice that the agreement can not override that the statute itself controls on the designation of who shall finally *retain* and not just who shall initially *obtain* the benefits. What the majority approves is the very kind of designation by alternative means that the federal precedents have voided.

¶60. At its analytical simplest, this federal program provides for a contract to be entered between the insured and the insurer. That contract controls over other contracts that the insured might enter or even over other obligations that might be imposed on the insured by the operation of state law. I will try to make clear that this is the manner in which the program has been nearly universally applied.

¶61. The executrix argues that the widow holds the FEGLIA proceeds in a constructive trust for the children or estate of the deceased, a trust allegedly arising from Mrs. Spradling's filing a claim for the proceeds in violation of the prenuptial agreement.

¶62. A constructive trust arises by operation of law against one who:

by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Saulsberry v. Saulsberry*, 223 Miss. 684, 690, 78 So. 2d 758, 760 (1955). The Supreme Court has

stated that "[i]t is the relationship plus the abuse of confidence imposed that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused." *Lipe v. Souther*, 224 Miss. 473, 484, 80 So. 2d 471, 475 (1955).

¶63. The executrix argues that the prenuptial agreement provided that all of the property of the deceased would go to his children or other heirs at his death, and that each party retained the right to all of their own property to the same extent as if they had never been married. She points out that both parties agreed to waive and release all of his or her interest in the other spouse's property, either as a surviving spouse or otherwise. Each agreed to make no claim against the estate of the other. Mrs. McCord alleges that Mrs. Spradling, by taking and keeping the insurance proceeds, is in violation of the agreement.

¶64. The widow admitted that it was her understanding that her deceased husband's intention was for the proceeds of the insurance policy to go to his children. She defended her filing of a claim on the basis that the insurance company told her that she was entitled to the proceeds.

¶65. The Federal Employee Group Life Insurance Act provides the order or precedence in paying a death claim on a policy issued under the Act:

> (a) First, to the beneficiary or beneficiaries designated by the employee in a signed and witnessed writing received before death in the employing office or, if insured because of receipt of annuity or of benefits under subchapter I of chapter 81 of this title as provided by section 8706(b) of this title, in the Office of Personnel Management. For this purpose, a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed has no force or effect.

> Second, if there is no designated beneficiary, to the widow or widower of the employee.

> Third, if none of the above, to the child or children of the employee and descendants of deceased children by representation.

> Fourth, if none of the above, to the parents of the employee or the survivor of them.

> Fifth, if none of the above, to the duly appointed executor or administrator of the estate of the employee.

> Sixth, if none of the above, to other next of kin of the employee entitled under the laws of the domicile of the employee at the date of his death.

> (b) If, within 1 year after the death of the employee, no claim for payment has been filed by a person entitled under the order of precedence named by subsection (a) of this section, or if payment to the person within that period is prohibited by Federal statute or regulation, payment may be in the order of precedence as if the person had predeceased the employee, and the payment bars recovery by any other person.

5 U.S.C.A. § 8705.

¶66. At the time of J. W. Spradling's death, his predeceased first wife, Nadine, was the designated beneficiary of the insurance policy. Consequently, there was no living designated beneficiary. The order of precedence under FEGLIA was followed when the insurance company paid the proceeds to the widow.

The question is whether the prenuptial agreement provides the estate or Mr. Spradling's children with a legal tool by which they may dislodge the proceeds from the widow.

¶67. The most important authority on whether Mrs. Spradling's statutory right to claim the insurance benefits can be overridden by the prenuptial agreement is the United States Supreme Court's interpretation of a related federal insurance program for military personnel. *Ridgway v. Ridgway*, 454 U.S. 46 (1981). The Court held that no constructive trust arose from a divorce decree that obligated the soldier to provide an insurance policy for his children and ex-wife. Instead, the designation of beneficiary made according to the terms of the Serviceman's Group Life Insurance Act (SGLIA) controlled over the divorce decree.

¶68. Two separate reasons appeared for that result. One was that, like the insurance program involved here, SGLIA also contained an order of precedence that controlled the payment of benefits. *Id.* at 52. By regulation, a change of beneficiary "may be made at any time and without the knowledge and consent of the previous beneficiary," and that designation controlled over any other obligation. *Id*. at 53. The Court found that the existence of another document establishing obligations, such as a divorce decree, did not override the federal statutory mandate regarding the designation of beneficiaries. *Id*. at 56.

¶69. The second and independent reason for the decision is that another statute prohibited any attachment to be brought against the benefits paid under SGLIA. *Id*. at 60, (citing 38 U.S.C. § 770(g) (prohibiting any "attachment, levy, or seizure by or under any legal process whatever," regardless of whether the process commences before or after the receipt by the beneficiary)). There is no anti-attachment section to the FEGLIA program that is the subject of the present suit. Therefore, this independent reason for the *Ridgway* decision is inapplicable.

¶70. Several courts have considered the applicability of the *Ridgway* analysis about service member insurance benefits to the similar program for federal employees. A fact situation almost identical to the present appeal was addressed by Mississippi District Judge Tom Lee in *Metropolitan Life Insurance Co. v. Thompson*, 968 F.Supp. 312 (S.D. Miss. 1997). The insured federal employee had designated his wife as his beneficiary under the FEGLIA program. However, the two spouses' prenuptial agreement had provided that each would designate their children from prior marriages as beneficiaries of life insurance. *Id.* at 313. The court found that Congress intended for the beneficiary designated according to FEGLIA rules "to take precedence over any other potential beneficiary"; according to regulation, "a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed has no force or effect." *Id*. (quoting 5 C.F.R. § 870.902(b) (1997)). The court dismissed the prenuptial agreement in this manner:

> Therefore, although this court is unaware of a case which specifically addresses a beneficiary's purported waiver of FEGLI benefits through a prenuptial agreement, it is nonetheless clear that no matter what type of contract the insured executes to the contrary, a designated beneficiary prevails against all other claimants.

*Id*. at 314.

¶71. The principal authorities interpreting the statute and regulations upon which Judge Lee relied were the *Ridgway* decision regarding SGLIA and an Eleventh Circuit decision applying *Ridgway* to the FEGLIA, *O'Neal v. Gonzalez*, 839 F.2d 1437 (11th Cir. 1988). In *O'Neal,* the insured had named his aunt as the beneficiary under his FEGLI policy. He had also entered a contract with his live-in girlfriend to name her. *Id*. at 1438-39. The *O'Neal* court found that the FEGLIA designation of a beneficiary controlled for all

purposes, and no right to those proceeds by constructive trust or any other theory applied. *Id*. at 1440.

¶72. To similar effect as *O'Neal* are decisions in a variety of fact situations from the Second, Sixth, Seventh, and Tenth Circuits. *Metropolitan Life Ins. Co. v. Sullivan*, 96 F.3d 18, 20 (2nd Cir. 1996); *Huff v. Metropolitan Life Ins. Co.*, 675 F.2d 119, 121 (6th Cir. 1982); *Metropolitan Life Ins. Co. v. Christ*, 979 F.2d 575 (7th Cir. 1992); *Dean v. Johnson*, 881 F.2d (10th Cir. 1989). Each concludes that the benefits must be paid according to the statute.

¶73. The same result applies regardless of whether the federal statutory program is fulfilled through a specific designation by the insured or whether the default section of the statute is invoked by the failure to have a surviving named beneficiary. The point is that the entire range of distribution options is controlled by the statute. *Metropolitan Life Ins. Co. v. Christ*, 979 F.2d at 580-81.

¶74. Not only does the federal statutory scheme apply to the initial payment of the insurance proceeds, but the case law reveals that any alternative approaches to force the designated beneficiary after receiving the benefits to pay them to someone else also have failed. In other words, the federal statute that requires benefits to be paid in a certain way would not be satisfied by state proceedings that first permit the beneficiary to receive the payments but then takes them back from that beneficiary because of normal contract, equitable, or other state-enforced remedies. Whether state law rules impact before or immediately after the benefits are paid, they are equally ineffective.

¶75. The following is Judge Lee's reasonable interpretation of these principles:

> Furthermore, although the decedent's children argue that even if Gretchen is technically entitled to receive the benefits, she should nevertheless be estopped from collecting them, there is no question under the authorities cited but that Gretchen is entitled to collect her fifty-percent share of the proceeds,[1] since the language and intent of FEGLI create "an inflexible rule that the beneficiary designated in accordance with the statute . . . receive[s] the policy proceeds, regardless of other document or the equities in a particular case." *Dean v. Johnson*, 881 F.2d 948, 949 (10th Cir. 1989) [emphasis removed]. Indeed, analogous to the case at bar, even where the parties to a contract clearly intend to deprive, rather than to assure the named beneficiary of the right to any proceeds, the designated beneficiary prevails. *See, e.g., Estate of Hanley v. Andresen*, 39 Wash.App. 377, 693 P.2d 198 (Wash. App. 1984) (where divorce decree purported to divest named beneficiary of rights under FEGLI, failure to properly execute change in designation entitled named beneficiary to proceeds as against competing claimants). And in fact, even had a Mississippi court ordered Thompson to designate his children as the sole beneficiaries to the specific exclusion of Gretchen, as long as he followed the proper procedures prescribed by the policy for beneficiary designation, Gretchen would still be entitled to collect the proceeds. *See Metropolitan Life Ins. Co. v. McShan*, 577 F.Supp. 165 (N.D.Cal. 1983) (FEGLI Act preempted state court divorce decree requiring insured to maintain children as beneficiaries). It is clear, then, that Congress intended for the FEGLI insured's named beneficiaries to collect the proceeds allocated to them, notwithstanding any extraneous contract. To do otherwise would eviscerate the very purpose of the designation.

*Thompson*, 968 F.Supp. at 314.

¶76. Although we are not obligated to follow these lower court precedents interpreting *Ridgway*, we need to be guided by Judge Lee's final comment that we cannot "eviscerate the very purpose of the legislation,"

unless the statutory language requires it, regardless of any distinctions we might draw between the present case and those just discussed, For a variety of reasons, I find that any such distinctions would be error. First, it has been shown that the SGLIA interpreted in *Ridgway* was modeled on the FEGLIA that we are analyzing. *Stribling v. United States*, 419 F.2d 1350, 1353 (8th Cir. 1969). Second, *Ridgway* itself makes a strong policy statement that the statutory process for designation of beneficiaries at least under SGLIA and, I believe, also under FEGLIA, is an unchangeable congressional mandate. The statutorily determined beneficiary -- whether by explicit designation or by the statutory default if there is a failure to designate -- is entitled to the benefits. Other interests such as arise under state law are important, but these cases show that the congressional enactment preempts them.

¶77. There is a possibly contrary argument in *Ridgway* itself that should be addressed. The *Ridgway* majority and dissent divided over the meaning of *Yiatchos v. Yiatchos*, 376 U.S. 306 (1964). The United States Supreme Court's majority view was that *Yiatchos* prevented federal preemption from shielding fraud or breach of trust when there were efforts to "divest the wife of any interest in her own property." *Ridgway*, 454 U.S. at 59 n. 8. By contrast, the soldier Ridgway had "misdirected property over which he had exclusive control," namely, the insurance benefits arising from his military service. *Id.* Looking to yet another precedent, the Supreme Court said that "Congress made clear its intent to allow a serviceman to select the beneficiary of his own gove rnment life insurance policy regardless of state law," which meant that designation controlled over state law constructive trust arguments. *Id.* (quoting *Wissner v. Wissner,* 338 U.S. 655, 670 (1950)). A later court interpreted this discussion as "limiting *Yiatchos* to situations in which a person had fraudulently divested a victim of a victim's own property." *Metropolitan Life v. Christ*, 979 F. 2d at 581.

¶78. Any broader application of the constructive trust exception, as desired by Mrs. McCord on this appeal, all but cancels the holding in *Ridgway.* Violation of an agreement that granted someone else a right to insurance proceeds, whether in a divorce decree, a prenuptial agreement, or somewhere else, exists in each of these precedents. That by itself cannot be said to permit the constructive trust theory to apply or else *Ridgway* means nothing.

¶79. Both the FEGLIA and the SGLIA programs require that the insurance proceeds be paid to and retained by the beneficiaries named according to the statutory procedures for designation. No one else has a claim to those proceeds by state law, either to divert them before the insurer makes payment to beneficiaries or to acquire them after they arrive.

¶80. The majority's view is plausible enough but it is foreclosed by the precedents. The guiding principle is that the FEGLIA and SGLIA require that the beneficiary under the terms of those statutes receive the benefits despite anything to the contrary. Had a relevant contract existed prior to the enactment of one of these statutes, there might be some impairment of contract issues. But for us in this case, as well as the other courts that I have cited, no such issue exists. In order to achieve the goal of guaranteed payments to the statutory beneficiaries, the statutes override all contrary efforts arising from other court proceedings, from agreements the insured might enter, or from any other source. This case is not about semantics -- whether Mrs. Spradling "receives" the benefits or not -- but about entitlements. The majority blocks the fulfillment of the statutory scheme.

¶81. Agreements such as the one here in effect say "anything to the contrary in FEGLIA notwithstanding, the insured hereby agrees that the benefits paid at the time of my death will not be paid under the FEGLIA

scheme but as I have otherwise provided." That was accomplished in the present case by the beneficiary's agreeing in the prenuptial contract not to claim the benefits even though she would be entitled to them. That is a slightly different variant on other approaches to avoid the FEGLIA scheme, but one that I find suffers from the same defect. Claiming the benefits requires an affirmative act, one that the majority says violates the prenuptial contract and creates a breach of contract action. Though it *may* be a breach of contract, for us to nullify the claim for benefits in this manner is a certain breach of the wall of protection that the case law has constructed around the certainty that payments as the statute requires will be effectual.

**McMILLIN, C.J., AND BRIDGES, J., JOIN THIS SEPARATE OPINION.**

1. [*Thompson* footnote] Moreover, Gretchen will not be required to hold the proceeds in constructive trust for the benefit of the children. See *Mercier v. Mercier*, 721 F.Supp. 1124 (D.N.D. 1989) (federal insured's designation of beneficiary prevails over state law of constructive trusts); see also *Metropolitan Life Ins. Co. v. McShan*, 577 F.Supp. 165 (N.D.Cal. 1983) (mere fact that FEGLI contains no attachment provision under which policy proceeds are protected from attachment, levy or seizure does not compel conclusion that a constructive trust may be imposed).